Well, we cleaned the house out. Mr. Barwick, good morning, Your Honor. May it please the Court, my name is William Barwick and it is my honor to represent Dwight Jordan, the appellant, in this case. This case involves a 1983 and 1985 conspiracy that was composed of members of the Darien, Georgia Police Department, the member, at least one, of the McIntosh Board of Education. And the purpose of the conspiracy was to cause Mr. Jordan to lose his elected office as a representative of a predominantly minority district of the McIntosh County Board of Education. This is not a case where there is simply bad judgment in an arrest gone wrong. This is not a garden variety type of civil rights case. This is, in fact, a case of premeditated political assassination. The purpose of Mr. Jordan's arrest, on two occasions, was that it was to make it impossible for him to win a re-election to his seat. And the arrest had to occur in such a way that they were both well publicized and staged for the media. Well, let's get to the summary judgment record, Mr. Barwick. And one of the questions I have, because the facts, at least the party's version of the facts, seem to be all over the place on some issues. Did any third party witnesses tell the officer who arrived on the scene the night of the council meeting, the board meeting, or the officer who was doing the was problematic in the way that he was alleged to have used it? That I will say any blank thing I want to do, any blank time I want to do it. Were there any third party witnesses who told either of those officers that Mr. Jordan had said those things? That's not definitive, but that's a starting point for figuring out what the summary judgment record looks like, it seems to me. No, Your Honor. There were no third party witnesses. And you've really hit on one of the critical odd things about the arrest in particular. That night, someone called the police department. One person, the chief, Donnie Howard, knows who that person was, but failed to disclose that during discovery. And we still don't know who made the initial call to report a disturbance at a public meeting. That's the incident report crime indicia. And the police officers were called by the chief on his cell phone, and they were told to go and investigate a disturbance at a public meeting. I know, I know all of that. So the officer arrives, however he got there, whoever got the police chief to get him to go, he arrives there. So far, there's no constitutional violation of any kind, right? Right. The police officers arrive. Instead of going into the public meeting at the Board of Education, they go one at a time, Davis first, then Brown. They go up to Mr. Jordan in the parking lot, where he's having a conversation with several of his constituents. And over here him, and Your Honor, I'm going to, with the court's permission, I'm going to use the gravamen of the cursing, the profanity, the fighting words, if you will. They overhear him saying that, and they say, if you say those words again, we're going to arrest you. And then he has a conversation with them about whether they have the right to tell him what to say in a conversation. And they're arguing back and forth whether he has the right to say that. And during the course of this discussion, these police officers apparently faced with a dilemma because they were supposed to arrest him, I believe, inside the meeting, but they got there too late. But they did know that they were there to get Dwight Jordan, which is why instead of going right into the meeting, which was where an event or a crime was being committed, they went right to Dwight Jordan. I know those are your allegations, and some of them are substantiated, I think. But again, my question, I want to know, for example, the officer who did the investigation after the fact, what was his name? That would be Roundtree. Okay. Roundtree was not there the night of the events in question, right? Correct, Your Honor. Okay. And so somewhere in his report, he writes that Mr. Jordan allegedly said certain things which give rise to, among other things, the disorderly conduct charge. Who told him purportedly that Mr. Jordan had said those things? When he did his investigation, he did not, and these would not be third parties, he did not apparently interview and record his interviews with the two arresting officers. So we have nothing that he memorialized from their recollection of what happened on the evening in question. The people he did talk to were actual members of the Board of Education who were inside the Board of Education meeting when an argument broke out between Mrs. Caldwell and Mr. Jordan. All of them, no, not all of them, I correct myself. Very few of them overheard even the words goddamn. The person who did testify or did give a statement to Roundtree that he heard that word was Mr. Day, who was one of the two people in the parking lot that Mr. Jordan was talking to. Everybody else in the Board of Education meeting did not hear him cursing in the parking lot. What did Mr. Day say? Mr. Day said that he said something to the effect of, I'm tired of this goddamn foolishness. But not, he didn't, Mr. Day did not report that Mr. Jordan had said things a way that the officer on the scene had recollected? That's correct. In fact, he said after the police officer came over and told Mr. Jordan to quit using profanity, Mr. Jordan quit using profanity. And again, the other people who were listed in the incident report as witnesses did not overhear that conversation in the parking lot. You answered my question. Thank you very much. May I also add that Roundtree was not just investigating what went on in the parking lot. Part of what Roundtree was assigned to do was to, in effect, reinvestigate or recreate the disturbance at the public meeting, not knowing that that statute had been declared unconstitutional some seven years earlier. So if you look at most of his report, including the warrant that he swore out for, I mean, the affidavit to get a warrant sworn out for the disturbing of a public meeting, all of it is centered on the political discussion and argument that was going on inside the Board of Education meeting, not what happened out in the parking lot. So at the very end, when the police officer was told that, you know, that statute is unconstitutional and that one gets ripped up, that's when the disorderly conduct under the state statute warrant is issued. And the gravamen of that is that he said the word, God damn, so loud that you could possibly hear it in apartments across the street, yet no investigation was undertaken. There was testimony that not only could you possibly hear it across the street, that people still inside the building when most people left, you could still hear it even though the doors were closed. People inside the building did not hear that cursing out in the parking lot. I'm under the belief that the majority of the people left and then when Mr. Jordan went out, he was so loud that people that remained there, the few people that remained, had told the investigating officer that they could still hear him. But in addition to that, when Officer Davis showed up, you know, I have no idea what was in his mind, but it seemed like he was trying to quell the situation and that your client kind of raised the heat level and to the point there, Officer Davis said he felt threatened. He thought, I think the word was, he was prepared to be in a fight, close quote, and that Ms. Caldwell feared that your client would be physically violent toward her. So I think it was more than just an off the cuff comment, an expletive. Your Honor, that, your Honor has quoted the officers, Officer Davis, in his testimony at his deposition. Right. Yet in the initial incident report, there is no such reference to feeling of any such fear or of a fight about to break out or of a threat or of Mr. Jordan, who is about 5'5", getting in these police officers' faces. If that had happened, he would have gone to jail immediately. Nor did they ever get questioned by Roundtree, who is doing his follow-up investigation in which he is tape recording statements that are taken from people who were purportedly witnesses to this whole event. They didn't do that as part of this sham investigation that Roundtree was. Well, you say sham investigation, but Roundtree interviewed everybody, you know, that was around there that apparently was a witness, or most everybody, because he is not required obviously under the law to ask everybody everything. But he talked to the people who were mostly involved in this, including, you know, council people who were there at the beginning of the meeting to the end. You used some strong language. This was premeditated political assassination. Yes, sir. And it was staged for the media. Yes, sir. Where is that testimony that was staged for the media? Your Honor, the And if it were, who was staging it for the media? Your client is the one who started the confrontation, it seems to me. There is nothing to the contrary. Your Honor, as I said before, I believe the purpose of the police officers was to arrive and arrest Mr. Jordan in the middle of a political argument at the Board of Education. I know that is what you think, or that is what you say you think. But what are the facts? What are the evidence? What did Roundtree have to deal with when he did this investigation? Roundtree himself stated, and we have this testimony, when he was interviewing a witness, and instantly he interviewed this witness who was the person who actually had the conversation with Mr. Jordan two days after his arrest. She said A girlfriend? Mr. Jordan's girlfriend? A friend. It was a woman. Was it a girlfriend? I mean, they have a relationship? I think that is how she was described. I don't know, Your Honor. I don't know. But she was under oath and she testified that Roundtree said to her, this situation pretty much has to do with his election that is coming up and there are other people that are pushing this and they want him off the board. And when they did have the arrest for the disorderly conduct, they issued something they never do. They issued a press release that they then sent over to Ms. Winneger, who was a longtime anti-Jordan writer on the Durian paper, to make sure that the press release was received the day after his arrest. Interestingly, they didn't go back and correct the press release because most of the press release discusses his conduct in the Board of Education meeting, which remember, that's what they were trying to recreate. That's the charge they wanted to charge him on. They just didn't realize it had been declared unconstitutional by the Georgia Supreme Court. So they got the picture of Mr. Roundtree being mugshot, the press release of him being booked. So they tried and they succeeded in maximizing the publicity that they would have gotten had he been arrested. We are getting a little off track here because I think what we should deal with is what did Roundtree have in his investigation in order to determine his probable cause and of course went to the magistrate and with the affidavit the magistrate issued a warrant, right? Right. Doesn't that give us some indication that there was probable cause or arguable probable cause? The issue of a magistrate's warrant does not eliminate the court's underlying obligation to investigate the reasonableness of the arrest and the circumstances of the arrest and the objectivity and or subjectivity of the arresting officer. That is ultimately a function for a higher court. But don't the cases say that that's a substantial consideration? It's an indicia. Well, more than an indicia, a substantial consideration. But it can be overborne by evidence particularly on the part of a non-movement in a motion for summary judgment. I understand that. You say something about that. We'll move to Mr. Perkins. May it please the court, I'm Ben Perkins. I represent Nicholas Roundtree, the investigator who at the conclusion of his month-long investigation presented his evidence, evidence he had gathered to a neutral magistrate for a probable cause determination. Each of the plaintiff's claims failed because there was no constitutional violation. There was probable cause for the arrest. And, Your Honors, I do want to make it clear to you that that is our argument. It is not just arguable probable cause. There was probable cause for this arrest. The existence of probable cause destroys the remainder of plaintiff's claims. Was the probable cause because of what he said in the meeting or what he said outside of the meeting in the parking lot? Judge Jordan, the case law tells us that we look at the totality of the circumstance. No, no. I want to know what the arrest affidavit was based on and the request for a warrant. Was that based on what he did inside the meeting or what he did in the parking lot when the police officer arrived? I think the arrest affidavit makes it clear and our argument makes it clear that his conduct once he left the meeting is what gave rise, gives us probable cause for the arrest. So, it's what he talked about in the parking lot? And what he did in the parking lot. And what he did in front of Mrs. Caldwell as she tried to reenter the facility. He gave her a reasonable apprehension of fear. She testified to that. She gave Officer Davis a reasonable apprehension of fear as well. And the combination of doing that... Did Officer Roundtree interview everybody or selectively interview some people? Officer Roundtree interviewed, I think, nine people and then there was an additional investigator who interviewed... Did he interview people who were sympathetic to Mr. Jordan? Certainly. Like who? I think the best example of a person who is sympathetic to Mr. Jordan is the person who changed his story dramatically, which would be Larry Day, the school superintendent. In the investigation, Larry Day is open and clear with his position and then we get to deposition of Mr. Day... What does he say in the... So, let's take each one of those points. What does he say to Officer Roundtree when he's doing the investigation? He confirms the use of the word G.D. He confirms the... Well, but the use of the word G.D. in and of itself can't give you probable cause, right? Certainly not. Certainly not. If you just say that as an... In and of itself, that's not enough. You need that combined with something else. That's right. Okay. So, what does the superintendent say that Mr. Jordan said in using that word? What was the context? What Mr. Day confirms is that Mr. Jordan was loud, irate, angry and he also confirms that Mr. Jordan was using at least the G.D. word. And when we got to his deposition, his story changed. My point there, Your Honor, is simply that Larry Day was sympathetic to Mr. Jordan. Ms. Boone was sympathetic to Mr. Jordan. She made that clear in her investigation and she said... She was the one that Judge Huck referenced earlier. She goes back to sitting in her board seat and she even confirmed to Roundtree that he was yelling... She went back where? I'm sorry? I called it her board seat, but her seat in the meeting room. And she confirmed that she could hear it through two separate closed doors. And she told that to the officer on the scene or to Officer Roundtree? Officer Roundtree during the investigation. Okay. Let me ask you one more question and then you can answer it as you wish during the rest of your argument. Why does Kingsland v. City of Miami not present problems for you? Well... Let me just start by saying that I'm sympathetic to your position because I was a district judge who got reversed in Kingsland. So I understand where you're coming from. But the court said that despite objective evidence of someone having committed a criminal violation, in that case driving under the influence, because there was some evidence that the officers selectively gathered evidence and some of them may have fabricated evidence. Summary everybody, even on qualified immunity grounds, even the officer, more particularly for Officer Roundtree, even the officer who came in after the fact, performed his own sobriety test and based on that independent sobriety test, gets denied qualified immunity. Why doesn't that case present a problem for you? Yes, sir. Okay. The first point I want to make about Kingsland is that that is the manufactured probable cause argument that was raised three days or four days before summary judgment. Under Hurlburt v. St. Mary's 439F3R1286, a 2006 11th Circuit case, a plaintiff cannot provide a new basis for a pending claim in the midst of summary judgment proceedings. That's what happened here. Had we been alerted in the course of discovery or hopefully in the initial pleading stage that plaintiff was alleging a manufacturing of evidence, then our discovery, the conduction of discovery would have been completely different. So that's my first point. The issue does not need to be reached by this Court because we were absolutely ambushed in the midst of summary judgment that this argument was even going to be made. But second, and I am sympathetic to your position, Judge Jordan, about Kingsland, but we do have the issue of the marijuana. This allegation that marijuana is reeking on this lady and in this car and yet their officers did nothing to look into that issue. You also have the blatant conflict of interest issue of one officer investigating another officer's arrest. We don't have that here. What we have here is a fully independent objective investigation conducted by an officer who was not there on the scene who then presented his findings to a neutral magistrate. So there's a great distinction between the facts of Kingsland and the facts here. He had an investigator also, didn't he? Yes, sir. And he also had a separate investigator assistant as well. Nobody has impugned the investigator as I understand it. That's my understanding, Your Honor, and that actually leads to another point. My client was an investigator and my client also had another investigator assist him. And I think if you look at this case, as far as the claim against Mr. Roundtree, I mean, they effectively are arguing he's a pawn. Well, if he's a pawn, then how in the world can he be a conspirator? It doesn't make any sense. There's no evidence whatsoever that Mr. Roundtree had a meeting of the minds with anyone to effectuate an arrest without probable cause. Thank you. Thank you, Your Honor. Ms. Hancock. May it please the Court, my name is Emily Hancock. I represent four of the defendants. With the Court's permission, I'll start with Defendants Davis and Brown. Officer Davis was the officer that first responded to the scene. I do want to clear up one factual issue. It is undisputed in the record that Larry Day, who has never been accused of being part of this conspiracy, a completely neutral third party, sent a text to Police Chief Donnie Howard during this meeting saying, you need to have an officer here. Apropos of what we do not know, no one remembers exactly what the text said, but Chief Howard got a text from someone at the board meeting, please send over an officer, and he did so. There is nothing in the evidence to suggest that Chief Howard ignored that, later got some other call from someone else saying, send someone over here to arrest Dwight Jordan, which is essentially what the plaintiffs were asking the Court to find. Larry Day summoned the officers. Officer Davis appears. They said, well, how did he get there in two minutes? He lived two minutes away, so there's another element of this conspiracy gone. Officer Davis arrives. He speaks with Mr. Jordan. Officer Brown arrives. He also speaks with Mr. Jordan, ends up eventually telling Mr. Jordan, I'm going to have to ask you to leave the premises or be arrested for disorderly conduct. Officer Davis and Brown did not arrest Mr. Jordan. This has been presented as though he were arrested at the meeting, but as this Court's decision recently in O'Boyle v. Thrasher confirms, someone who is told to leave a place, you can go anywhere else, you can't stay here, the police are not escorting him away from the place. They're just saying, you have to leave here. That person has not been seized within the meaning of the Fourth Amendment. The appellant has essentially conceded this by not ever making a qualified immunity, showing the only case they pointed to on qualified immunity in the district court was a decision from a northern district of Georgia, which is not able to establish the law for qualified immunity and was distinguishable on its facts. If the Court does not have any questions about Officers Davis and Brown, I will move on. Well, let me just, this may not have anything to do with the ultimate result of the case, but it seems like the people in Darien have really, really interesting sensibilities. If you're going to start arresting people for something like this, and then that's what gives rise to at least the argument or the view that this was all trumped up and made up. And if everything was based not on what Mr. Jordan allegedly did inside the meeting, but things he did outside and outside of Ms. Caldwell's presence, it seems pretty flimsy, at least to an outsider, not knowing the culture and mores of the city of Darien. Two responses to that, if I may. The first, I think it's critical that he was not actually arrested for this. The city of Darien is not making arrests for these reasons because neither Officer Davis nor Officer Brown arrested Mr. Jordan that night. They held back, and then there was an independent investigation that later led to the arrest. As to this being about acts in the parking lot outside of Ms. Caldwell's presence, part of what Ms. Caldwell reported when she talked to Officer Roundtree was that as she was at the exit of the building, so this is outside of the meeting, Mr. Jordan passed by her, she said got close up in her face, was yelling, you can call the governor, you can call the deals, you can call anyone you want. And that is when she reported she was afraid, not during the meeting, but she said Mr. Jordan made her fear for her safety, and this was outside the meeting in the parking lot. And Mr. Jordan admits that he did make those comments to her. And any threat he may have been presenting while he made those comments. But I think that goes to the conspiracy argument here as well, that to get to a conspiracy claim, there's got to be some sort of manufactured evidence, not just, well, we found some people who say one thing, we found some people who say another thing. The issue in Kingsland was you could have easily empirically verified whether there's marijuana in that car or not. Here, no matter how many people you interview, maybe you can find some who say Mr. Jordan was quiet, Mr. Jordan was calm. But there are numerous people, several of whom are not accused of being involved in this conspiracy, the newspaper reporter, Mr. Day, who contribute parts of this saying he was agitated, he was loud, he used this curse word. And so the evidence that's allegedly part of this conspiracy that's been drummed up is very much in keeping with the evidence that's not alleged to be a part of the conspiracy. The problem for me is, and I'm going to ask Mr. Barwick, when in the world was a conspiracy formed? When was the 1955 conspiracy put together? Because if the plaintiff hadn't done it, one question is, if the plaintiff hadn't done anything to start things rolling, was the conspiracy formed sometime earlier than that? Or was the conspiracy formed at some point after the ruckus occurred? So where, when, that's a big question. When was this 1955 conspiracy formed? Outside of the meeting? Later on? Nobody's explained that. I don't see it out of the record is what I'm trying to say. I have that question as well, and I also have not seen that in the record. And if I may say one last thing about At some point in time, they got together in violation of 42 U.S.C. 1955, allegedly, and decided to do something. Right. And so the question becomes, when did they all get together to do that? I suspect that And I suppose the argument is, is that it started off with two people in the conspiracy, and then people joined in. So then the next question becomes, when did they join in? I suspect Mr. Barwick's answer may be something to the effect of, if it weren't already formed, because there's zero evidence of anyone talking about this whatsoever before the April 18th meeting. We do know that Ms. Caldwell called Chief Howard the morning after the meeting. And I think to the appellant, that is when the conspiracy was hatched. There were a couple of very brief calls. We don't know anything about their content. And Chief Howard's involvement from that point forward was to order an investigation. And then as people came to him, approached him about it, because this is a small town. This is not an insignificant issue. When police show up to meetings, people are calling, wanting to talk to the chief about it. And he would refer them to the investigator. And that was his involvement in the investigation. At the conclusion of the investigation, unlike judges in cases who have been found not to, or I'm sorry, unlike police chiefs who have been found not to be personally involved enough to be liable under 1983, Chief Howard did not even tell Officer Rowntree, well, why don't you take that to the judge and see if you have probable cause. Chief Howard said, he's a smart officer. He knows what he's got. It was up to him what he was going to do with it. And that was the extent of Chief Howard's involvement. We'll hear from Mr. Nguyen. Thank you, Your Honors. Good morning. If it may please the Court, my name is Hugh Nguyen with Harbin, Hartley & Hawkins. I represent Defendant Bonita Caldwell. The only claims against Ms. Caldwell arise out of the Section 1983 and Section 1985 conspiracy. She joined up at some point. Either it was pre-existing, the meeting altogether, or at some point later on, and people with a wink and a nod sort of joined in. That's correct, Your Honor. Your question is precisely our concern, and we asked that same exact question in our brief. This morning, Mr. Barbic has stated, and then after a question from Judge Huck, stated again, that he believes that the officers were supposed to have arrested the plaintiff at the meeting. What's critical for that supposition is, in order to have a conspiracy, Ms. Caldwell has to be involved. Because all the officers work together under the inter-corporate conspiracy doctrine, as this Court is well aware, they cannot conspire with each other. So Caldwell is critical for their conspiracy claim. There is absolutely, despite extensive discovery, thousands of pages of emails produced and phone records produced, there is absolutely no evidence of any communication at all whatsoever between Caldwell and any of the individual defendants prior to or on the day of that April 18th meeting. So the conspiracy simply could not have, or there's no evidence at all of any communication prior to or on the day of that meeting. Without the linchpin of a conspiracy's communication, the Bailey case we cited offers that. There's no evidence of that. The only evidence after the meeting that was presented was other than two one-minute phone calls, which we believe were, could not reach a plaintiff on tag. There was a two-minute phone conversation and a six-minute phone conversation the day after the incident at the board meeting. And then about two weeks later, three weeks later, an eight-minute phone conversation between Ms. Caldwell and Chief Howard. And then the only other communication was a five-minute phone call the day before the interview between Detective Roundtree and Ms. Caldwell. Testimony is that that phone conversation was to set up the meeting, can you come in to talk about it, five-minute phone call. And then there was a five-minute phone call after that meeting, I believe it was two days after the meeting, or it was the weekend, so three days after the meeting, where The guy had already been tested by that time, allegedly, I guess. Well, that was still during the part of I was still worried about when was it formed. I have no idea when it was formed, okay? There's no evidence to show at any point when it was formed, plaintiff has taken two separate positions, that it was formed before or it was formed after the April 18th meeting. That's part of the problem, because the evidence does not show there was no conspiracy. Plaintiff cannot present any evidence to show what the conspiracy was or when it was hatched in the first place. And these short phone conversations, it is not reasonable inference to draw that a conspiracy was hatched during these short phone conversations. I see that my time is over, I'm happy to answer any additional questions from the court. I think we understand your point. Mr. Barwick? Thank you. Can you tell us when the 1955 conspiracy was formed? We can tell you, Your Honor, that it was certainly in existence as of April 19th, the day after the board meeting, when the telephone conversations began, and Ms. Caldwell and Chief Howard So the conspiracy was to have a detective in his investigation sort of rig the deal, is that it? It was at that particular point. In other words, there was no conspiracy of any kind prior to the day after. No, Your Honor, that's not correct. When in advance of the investigation did the conspiracy form and who were the members? If you go with what the conspiracy… No, no, no, just tell me. Okay. Without citing something, just tell me as a matter of fact, when following the day after, when did it begin, where was it, and who was present? As of April the 19th, telephone calls went back and forth the day after the board meeting between Chief Howard, who was the chief of the Darien Police Department… We know who he is. …and the chair of the Board of Education. They, when confronted with these telephone calls, which they initially did not… Wait a minute. The two of them started off, and what was the object of the conspiracy at that point? To determine why the police officers had not arrested in public Mr. Jordan the night before, and it simply… Conspiracy to determine why they hadn't been arrested? The conspiracy was why he hadn't been publicly arrested the night before. Why didn't the police officers arrive in time? That's not a… Was the conspiracy to have an investigation and make sure that he got arrested and charged? Yes. And that's where it was formed? Yes. Okay. At that point, yes. When did Brown and Davis enter that conspiracy? Brown and Davis entered that particular conspiracy. That was formed afterwards. When did they join up? At that particular point in time, their involvement was… First of all, they had committed… No. After Caldwell and the chief formed the conspiracy to have an investigation to have him arrested and charged, when did they join in? When they adopted the official line that they had to fabricate a reasonable fear testimony. And when did they do that? That may well have been post-litigation because it's only post-litigation… Post-litigation. You understand the question I'm after? I want to know when it was formed and when they joined in, either with a wink and a nod or some other thing. Your Honor, if you let me, I can give you a site to a particular piece of evidence that shows Roundtree… Could you just tell me when? It would have been on April 29th. Is that when Roundtree had begun his investigation? He had begun his investigation… Okay, so he is now a conspirator. He is now a conspirator. With Caldwell and the chief. With Caldwell and the chief. And the objective is to create probable cause for his arrest and charge. Right. And Roundtree is telling Ms. Caldwell, remember when you talked yesterday with the chief and you discussed your reasonable fear. That is when Roundtree… I take it that under Monell, the city is in because the chief is the policymaker. Correct. Is that right? Correct. Okay. Now, if I might have just a minute or so… Can I ask you one brief question? Yes, Your Honor. It was represented that Mr. Day is not on the other side of your client politically. Okay. And that he is the one who texts Howard to send over a police officer because things have gotten out of hand. No, Your Honor. He couldn't have. That didn't occur? It wasn't Day? No. We know when he sent a text message to the chief. It was either a text message or telephone call. Of course, we have the timing on that. The timing, however, is several minutes, I believe it was six minutes, after Officer Davis had arrived on the scene to investigate the disturbance at a public meeting. So, Day could not have been the one. Did Day text the chief and say, send somebody over? No. He said, why wasn't there a security officer at the meeting tonight? Okay. Suggesting that it would be nice to have a security officer because… As a general rule, that would be the case. Excuse me. Let me finish my question. Sorry. I'm sorry. Suggesting that there should be a security officer there because things have gotten somewhat out of hand. That's a fair reading of that, right? I don't think it is, Your Honor. Okay. Why would he be asking for a security officer? Well, I think, first of all, it is unusual that there was no security officer and Mr. Day had seen an argument taking place. And the security officer acts somewhat as a sergeant of arms. And there had been an officer usually assigned to that. He wasn't there that night. And we don't think that that was entirely coincidental. Was Day part of the premeditated political assassination of your client? No, Your Honor. Okay. He was one of the two people, actually, that my client was talking to. The other, Ms. Walton, was not a person that was interviewed until after Mr. Jordan had been arrested. And then, finally, Alvin Liepard, who was the attorney for the Board of Education. You've answered my question. Okay. I just wanted to address something that had come up. Who was not selectively interviewed or not? Alvin Liepard was the attorney for the Board of Education and had been there for the entire meeting. When Officer Brown brought my client back in before throwing him out of the meeting, Mr. Liepard was asked. Officer Brown threw your client out of the meeting? He told him he had to leave or be thrown in jail. He didn't physically seize him. He didn't physically throw him out of the meeting. He allowed him to go back in to retrieve his personal goods from outside. Isn't that what happened? He followed him in. And if you look at the photographic evidence, he's pretty much towering over him. But they asked Mr. Liepard, is there any reason, Jordan said, is there any reason for me to have to leave this meeting? And Mr. Liepard said, I don't see any. He'd seen the entire Board of Education meeting. He'd seen the argument between the press. That's irrelevant. The conspiracy didn't form until the next day. Your Honor, I said we have proof that there was a conspiracy in place as of the 19th. Oh, you mean before the ruckus occurred? All right. When was that formed and who were the original people and where was it? I think the original people were Caldwell and Howard. Caldwell and Howard. And when did they meet to conspire before the meeting? They could have been at any time, Your Honor. No, no, no. What does the evidence show about their meeting beforehand? Your Honor, I think there is no particular evidence that we can cite to the record. We can't draw an inference that the conspiracy began before the meeting. The inference, the reasonable inference, is the conduct and what happened in the parking lot. I understand that. I'm looking for the evidence that yields the inference that the meeting, that notwithstanding the ruckus that occurred, there was a conspiracy to do what? Remove him from office? Arrest him while the meeting was going on. No, no, no. Arrest him? Arrest him. But he had done nothing? You mean he was going to be arrested at a regular meeting where he was behaving himself? No. Ms. Caldwell provoked an argument, a very heated argument, with him two minutes before the police arrived. All right. So the conspiracy was she would provoke him into an argument and then he would be arrested? The police would arrive shortly thereafter and arrest him. Okay. That's the whole deal. On television. Okay. And that explains why the chief sent the two officers. Correct, Your Honor. That's your argument. And without any evidence of anyone contacting the chief to send someone. So it must have been that Caldwell and the chief communicated before the meeting. Yes. And I apologize for not understanding your question. I should have made that clear. Well, I think it's key. I do, too. I speak for myself. I do, too. Okay. Thank you, Your Honor. Thank you for being recessed under the usual order. All right. Thank you. Thank you. Thank you.